IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Arizona Coalition Against Domestic Violence, | No. CV-11-1626-PHX-ROS |
| Plaintiff, | **ORDER** |
| vs. | |
| John Greene, | |
| Defendant. | |

Plaintiff has moved for a preliminary injunction. For the following reasons, the motion will be granted.

## FACTUAL BACKGROUND

Plaintiff Arizona Coalition Against Domestic Violence is a "501(c)(3) non-profit membership organization, based in Phoenix, Arizona, comprised of domestic violence member programs and other concerned individuals and groups across the state." (Doc. 18-2 at 4). Members of this organization provide victims of domestic violence a wide variety of services such as emergency shelter, transitional housing, legal advocacy, and "referrals for medical care, including clinics that provide abortion and other forms of reproductive health care." (Doc. 18-2 at 5).

In 1997, Arizona enacted a tax credit scheme that created an incentive for individuals to donate to qualifying charitable organizations that provide help to the working poor. That scheme became known as the Working Poor Tax Credit Program (the "Program"). As originally enacted, the Program allowed an Arizona taxpayer who donated to a "qualifying charitable organization" to take a dollar-for-dollar credit against his state taxes in the amount

of his donation. Under the 1997 statute, to be a "qualifying charitable organization," an organization had to meet only two criteria:

> 1) the organization was "exempt from federal income taxation under § 501(c)(3) of the internal revenue code"; and
>
> 2) the organization spent "at least fifty per cent of its budget on services to residents of this state who receive temporary assistance for needy families benefits or low income residents of this state and their households."

1997 Ariz. Legis. Serv. 300 (S.B. 1357) (West).

From 1998 to the present, a wide variety of organizations participated in the Program. Because many of Plaintiff's member organizations "rely heavily on private donations to survive," Plaintiff counsels its members to "take advantage of and participate in the [Program], assuming they meet the criteria for participation." (Doc. 18-2 at 5-6). The organizations that choose to participate in the Program, "report that participation in the tax credit program leads to a tangible and important increase in donations." (*Id.* at 6). Given recent decreases in funding from other sources, any "additional cuts in funding [to the organizations] would result in a further decrease in services and programs and could even result in the closure of domestic violence programs around the state." (*Id.* at 5).

In early 2011, State Representative Debbie Lesko introduced House Bill 2384 to change the Program's definition of "qualifying charitable organization." 2011 Ariz. Legis. Serv. Ch. 55. Under the proposed language, an organization could not participate in the Program if it "provides, pays for, promotes, provides coverage of or provides referrals for abortions" or if it "financially supports any other entity that provides, pays for, promotes, provides coverage of or provides referrals for abortions." *Id.* At a hearing before the House Health and Human Services Committee, Ms. Lesko explained the purpose of the proposed change:

> I believe God has put me here for a reason. And I often ask Him, "What is that reason?" and I ask for a purpose. [I ask Him to] "Please guide me and tell me what you want me to do." And I truly believe that one of the purposes that I have been put in this position is to protect the lives of innocent children. The current law prohibits the use of taxpayer money for abortions. However, there's been some loopholes that have been identified and my bill is an attempt to close those

> loopholes. . . . [The proposed bill] prohibits organizations that provide, pay for, promote, provide coverage of or provide referrals for abortion from receiving donations through the Working Poor Tax Credit. Members [of the Committee], if you share my concern about the lives of innocent, unborn children, I ask that you support my bill.

*Available at* http://azleg.granicus.com/MediaPlayer.php?view_id=13&clip_id=8422. The bill passed with no changes relevant to the present dispute and was signed into law in April 2011. The bill is scheduled to go into effect on January 1, 2012.

Plaintiff argues, and Defendant does not dispute, that the revised statutory language ("revised Program") "prohibits Plaintiff's members from receiving a government benefit (participation in the tax credit program) based solely on the exercise of pro-choice, abortion-related speech." (Doc. 18 at 12). In other words, only those organizations that "express a pro-choice viewpoint" will be prohibited from participating in the Program; organizations that express an anti-abortion viewpoint will remain eligible. Plaintiff seeks a preliminary injunction preventing the revised Program from taking effect.

## ANALYSIS

### I. Standard for Preliminary Injunction

The Ninth Circuit has adopted two different tests a district court must use when deciding whether to grant a preliminary injunction. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (finding district court "made an error of law" by employing only one test when denying preliminary injunction). First, a plaintiff seeking a preliminary injunction can attempt to satisfy the four-part test adopted by the Supreme Court in *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008). Under that test, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. Alternatively, a plaintiff may show there are "serious questions going to the merits," the balance of hardships tip sharply in his favor, there is a likelihood of irreparable injury, and the injunction is in the public interest. *Cottrell*, 632 F.3d at 1135. This latter "sliding scale approach" allows a plaintiff to make a lesser showing of likelihood of success provided he will suffer substantial

1  harm in the absence of relief. *Id.* at 1133.

## II. Plaintiff Has Standing

The first issue the Court must address is whether Plaintiff has standing. At the preliminary injunction hearing, Defendant conceded "that under existing case law . . . Plaintiff has organizational standing." (Nov. 16, 2011 Hearing Transcript). Despite this concession, the Court has an independent obligation to confirm the presence of standing. *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 954 (9th Cir. 2011). Because Plaintiff is bringing suit on behalf of its member organizations, the standing inquiry depends on satisfaction of the three-part organizational standing test. Pursuant to that test, Plaintiff's members first must "have standing to sue in their own right." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). Second, the interests at stake in the litigation must be germane to Plaintiff's purpose. *Id.* And third, "neither the claim nor the relief requested" can require "the participation of individual members in the lawsuit." *Id.* Based on the present record, Plaintiff satisfies this test.

There is no dispute Plaintiff's member organizations would be directly and adversely impacted if the revised Program were to take effect. The member organizations would either have to stop promoting or providing referrals for abortion or forfeit the benefit of tax-deductible contributions. Thus, the organizations would have standing to sue in their own right. In addition, Plaintiff alleges it was formed "to enhance the delivery of services to domestic violence victims," including the provision of medical counseling to victims. An interest in providing unencumbered medical counseling is germane to this purpose. And finally, neither resolution of Plaintiff's claim nor the relief requested requires the participation of individual members. The question the Court must resolve requires application of the First Amendment to undisputed facts. In these circumstances, the presence of individual members is not needed. Plaintiff has standing to challenge the revised Program.

## III. Plaintiff Has Shown a Likelihood of Success or Serious Questions Going to the Merits

- 4 -

Plaintiff's two arguments in support of a preliminary injunction are that the revised Program places an unconstitutional condition on participation and that the revised Program constitutes a forum for speech where viewpoint discrimination is prohibited. Given how the revised Program would operate, Plaintiff has shown either a strong likelihood of success or, at the very least, serious questions going to the merits on the issue of the revised Program imposing an unconstitutional condition. Given this conclusion, the Court need not reach Plaintiff's second argument regarding the revised Program constituting a forum for speech.

### A. State Funds Are Not Involved

Before reaching the unconstitutional condition issue, it is important to point out what is *not* at issue here. According to its sponsor, the revised Program is an attempt to correct a "loophole" which allowed taxpayer money to be used by organizations which promoted or provided referral for abortion. Under this view, tax credits are functionally equivalent to a cash grant from the government. Thus, the provision of tax credits to individuals who choose to donate to certain organizations is a form of state funding of abortion related activities. This understanding of the tax credit program finds support in Supreme Court case law. *See, e.g.*, *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 544 (1983) ("A tax exemption has much the same effect as a cash grant to the organization of the amount of tax it would have to pay on its income.").

Despite being the apparent basis for enacting the revised Program, Defendant does not argue the revised Program actually implicates state funding. This is due to both the Arizona Supreme Court and the United States Supreme Court having concluded that tax credits do not constitute state expenditures.[1] *Kotterman v. Killian*, 972 P.2d 606, 618-19 (Ariz. 1999); *Ariz. Christian School Tuition Organization v. Winn*, 131 S. Ct. 1436 (2011). Because

---

[1] Those conclusions were reached in the context of religious disputes and the result may be different in the context of free speech challenges. *See* Donna D. Adler, *The Internal Revenue Code, the Constitution, and the Courts: The Use of Tax Expenditure Analysis in Judicial Decision Making*, 28 Wake Forest L. Rev. 855, 857 (1993) (judicial treatment of tax credits "changes depending on the substantive area of law being considered"). But Defendant does not argue for a different result based on this not being a religious dispute.

1 Defendant concedes the revised Program does not involve governmental spending, the Court
2 need not address the thorny area of government funding decisions. *Compare Rust v.*
3 *Sullivan*, 500 U.S. 173 (1991) (approving funding conditions) *with Legal Services Corp. v.*
4 *Velazquez*, 531 U.S. 533 (2001) (rejecting funding conditions).

### B. The Program Imposes An Unconstitutional Condition

Plaintiff argues the revised Program is "patently unconstitutional" because it conditions participation in the Program "on relinquishment of the right to engage in pro-choice, abortion-related speech." (Doc. 24 at 3-4). According to Plaintiff, this constitutes an "unconstitutional condition." Plaintiff has shown there are at least serious questions going to the merits of this position.

The "unconstitutional conditions" doctrine provides that "even though a person has no right to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests–especially, his interest in freedom of speech." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). This recognizes that denying a benefit based on one's constitutionally protected speech is equivalent to directly penalizing such speech. *Id.* The "unconstitutional conditions" doctrine has been used to invalidate conditions such as: requiring the display of a state motto in order to use roads, *Wooley v. Maynard*, 430 U.S. 705 (1977); requiring schoolchildren to salute the flag in order to attend school, *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943); and requiring property owners sign a declaration stating they did not advocate the overthrow of the government in order to qualify for a tax exemption. *Speiser v. Randall*, 357 U.S. 513 (1958). Requiring organizations refrain from otherwise fully protected speech regarding abortion in order to qualify for tax-advantaged contributions appears to be roughly analogous to these examples.[2]

---

[2] The "unconstitutional conditions" doctrine is a notoriously difficult area and has "vexed our brightest constitutional theorists." Dale Carpenter, *Unanimously Wrong*, 2006

There is no dispute that Plaintiff does not have a constitutional right to the existence of the Program. Arizona could repeal the Program in its entirety without violating Plaintiff's rights. Arizona could also choose to condition participation in the Program on viewpoint-neutral criteria.[3] But what Arizona very likely cannot do is deny participation in the Program *solely* on the viewpoint expressed by an organization regarding abortion. Doing so is an attempt by Arizona to "accomplish through a condition something it cannot demand outright." *Palmer v. Valdez*, 560 F.3d 965, 972 (9th Cir. 2009). That is, Arizona could not punish an organization with a fine if it were to engage in certain types of abortion-related speech. Excluding an organization from the Program solely because of the type of abortion-related speech which the organization engages in is an attempt to impose a similar financial harm. Therefore, Plaintiff has shown a likelihood of success on its unconstitutional conditions claim. At the very least, Plaintiff has established the presence of serious questions going to the merits.

**IV. Irreparable Harm**

Having satisfied the first requirement for obtaining an injunction, the next inquiry is whether Plaintiff has established the likelihood of irreparable harm. There is "a long line of precedent establishing that the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1128 (9th Cir. 2011). Were the revised Program to take effect, individuals and organizations would have to choose between expressing their views regarding abortion and remaining eligible for participation in the Program. Given the factual context, requiring this choice likely is an infringement of First Amendment freedoms. Therefore, Plaintiff has

---

Cato Sup. Ct. Rev. 217, 226 (2006). Unfortunately, Defendant does not make a persuasive effort to explain its position regarding the doctrine.

[3] Arizona likely can limit participation in the Program based on subject matter. Thus, Arizona probably could enact a viewpoint-neutral exclusion regarding abortion. *Cf. Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 806 ("Control over access to a nonpublic forum can be based on subject matter . . . .").

- 7 -

1  established a likelihood of irreparable harm.

2  **V. Balance of Equities**

3  In assessing the balance of equities, the Court must "weigh the damage to each" party 4 in the event an injunction is granted. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th 5 Cir. 2009). Plaintiff claims the balance of equities tips in its favor because an injunction 6 preventing the revised Program from taking effect will prevent a violation of the First 7 Amendment while merely requiring the Program continue in the form it has operated since 8 it was originally enacted. Thus, Plaintiff believes the harm to Defendant will be minimal. 9 Defendant counters that an injunction might lead to a situation where a taxpayer makes a 10 donation to an organization eligible under the original Program but not under the revised 11 Program. In this scenario, once the revised Program takes effect, the previous donation 12 would no longer qualify for preferential tax treatment. Thus, Defendant believes granting 13 an injunction would introduce a burdensome uncertainty to the Program.

14  Defendant is correct that an injunction may create some uncertainty regarding the tax 15 treatment of donations to certain organizations. But this uncertainty is speculative in that if 16 the revised Program takes effect, its effective date might be tailored to prevent difficulty 17 regarding donations. For example, the revised Program might be given purely prospective 18 application such that the tax treatment of donations to organizations are determined at the 19 time of the donation; donations made prior to the effective date would be eligible for 20 preferential tax treatment even if the recipient organization is ineligible going forward. 21 Given this possibility, the very likely damage to Plaintiff in the event the revised Program 22 is allowed to take effect easily outweighs the possible damage to Defendant should an 23 injunction issue.

24  **VI. Public Interest**

25  Finally, the public interest also weighs in favor of an injunction. There is a 26 "significant public interest in upholding First Amendment principles." *Sammartano v. First* 27 *Judicial District Court*, 303 F.3d 959, 974 (9th Cir. 2002). But this interest may be 28 "overcome by a strong showing of other competing public interests." *Id.* Defendant claims

there is "a strong public interest in stability and certainty, particularly with respect to taxation." (Doc. 23 at 8). It should go without saying, however, that the public's interest in "stability and certainty" cannot overcome violations of First Amendment freedoms. To hold otherwise would allow Arizona to enact any manner of unconstitutional laws and then defend those laws as in the public interest because they provide "stability and certainty." The public interest weighs in favor of an injunction.

### VII. Conclusion

Plaintiff has satisfied the traditional standard for obtaining a preliminary injunction: Plaintiff has shown a likelihood of success on the merits, a likelihood of irreparable harm, the balance of equities tips in Plaintiff's favor, and the public interest is in favor of an injunction. *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). Plaintiff has also satisfied the alternative test of establishing there are "serious questions going to the merits," the balance of hardships tip sharply in its favor, there is a likelihood of irreparable injury, and the injunction is in the public interest. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

Accordingly,

**IT IS ORDERED** the Motion for Preliminary Injunction (Doc. 17) is **GRANTED**. Defendant is enjoined from enforcing the portions of Arizona House Bill 2384 referenced herein pending a final decision on the merits.

**IT IS FURTHER ORDERED** no later than January 9, 2012 the parties shall file a joint status regarding how this case will proceed. In particular, the parties should indicate whether discovery is necessary or if the Court should consider a motion for permanent injunction.

DATED this 22nd day of December, 2011.

Roslyn O. Silver
Chief United States District Judge